Good morning ladies and gentlemen we are here and Judge Rovner is here also as a member of our panel who is appearing by video so the lawyers will see her at the podium and we have her right in front of us so good morning also Judge Rovner Our only case for this morning is Ward against Neal and Miss Donnelly we'll hear from you whenever you're ready Good morning and may it please the court obviously I'm here to discuss Mr. Ward's one and only claim and that is about the ineffective assistance of counsel at the one and only phase of this trial the penalty phase and what is different about this case very unusual about this case is that it's not tethered exclusively to counsel's failure to collect say the central state records or present highly aggravating evidence on behalf of her client she portrayed her client through the two expert witnesses Dr. Friedman and Dr. Parker as an incurable psychopath someone who was born without a conscience according to them incapable of feeling normal human emotions incapable of feeling remorse so let me ask you this in general she's trying to raise a claim of mental incapacity in a way I'll say mental disease or so but trying to show the jury that he has those failings was one of the strategies available if she had tried to show he was autistic it would have been the same thing autistic people have flat affect they don't relate to other people they don't have at least the ability to demonstrate normal emotion so yes the word psychopath may be maybe a troubling word but she's she's trying to tell the jury that this wasn't somebody like you or me just who decided to go out and commit this ghastly crime well there that may have been what she was trying to do but there are some problems there first of all the research on on the effect that psychopathy has on on jurors is very sound and very strong they consider it aggravating because it suggests that this person is going to be a future danger I don't know of anything similar with respect to autism and a person with that type of disorder may indeed have a lot more sympathetic qualities and options available to them than say someone who is incurable a psychopath and born evil but is your big complaint about the use of the word psychopath because at the post conviction stage antisocial personality disorder and other milder terms are just different terms I'll say I'm not sure if it's milder but other terms were used so is it really just about this word well the word itself does have a connotation in the community that antisocial or autism does not have so that that is there is something about the word but no it's not just about the word it's what the doctor said about Mr. Ward and how far they went I mean they went to the point where they were suggesting he was enjoying the trial they they suggested that he would be a danger in prison without any evidence to suggest that that's true and Dr. Friedman even incorrectly said that there was research suggesting that what is true so it's not just the word it's everything that they said about the word everything that a jury was later to infer from the way that they described this person they dehumanized him miss Donnelly apart apart from judge Jacoby what significant witnesses did the mitigation investigation that was conducted for purposes of the post conviction hearing disclose that were unknown to the defense at the time of the second trial she did not get well two things she did not get the central state records and that showed that a that he had been diagnosed with a compulsive disorder that he had wanted treatment and he is quoted as saying he really wanted to get help so that created a very different picture of him she also did not enter apparently at least according to some of the testimony witnesses interview them Don Scott or other witnesses regarding Mr. Ward's traits that went beyond those that suggested psychopathy so Don Scott testified to that for example there was also a teacher that other information about his learning disabilities and so forth that she didn't explore and and talk to would you agree that had the words anti-social personality disorder been used that there would have been evidence to show that that is something that you as untreatable as well well actually dr. Freeman specifically testify the anti-social personality disorder was different less severe and treatable something that could be changed but couldn't somebody say that he wasn't suffering from the less severe whatever label you want to put on it you know just like a really bad case of anti-social personality disorder or a more severe case to which a different word is attached I'm not sure why the decision of the Indiana courts to accept these more severe characterizations is error to accept well I mean that so the Indiana court decides that the use of the word psychopath isn't in itself a reason to require another round of this they do have all of these questions and there's does seem to be a lot of that he's a person with very serious problems well that he does have very serious problems one very serious problem is that when he was eight years old he started compulsively exposing himself and that's subject to him to ridicule and shame as a child and he had a very severe learning disability he has a low IQ but those are not in the same capacity category as so so my biggest question for you frankly is even if I were to agree with you that there were deficiencies at the second trial and the lawyers performance so significant as to meet the first part of Strickland the Indiana courts all say that there was no prejudice from whatever deficiencies in investigation deficiencies in and as you know Harrington against Richter tells us that we review a determination like that with a great deal of respect for the way the state court evaluates the evidence how can we say they were wrong well first of all the Indiana Supreme Court failed to consider that there was any harm done by the presentation of the psychopathy evidence because not only did it add aggravation significant aggravation to the to the scale it also undermined any mitigating facts that were presented they assume and I read it to say we just don't get how there could have been any prejudice in light of the record the full record that was before the second jury in light of the crime there is no such thing as a mandatory death penalty it's not mandatory I mean they're certainly looking at all of the facts I can't see them saying well you know you tortured and mutilated therefore you get the death penalty they they went into much more detail in that well they they they said that the crime had very very high weight and that there was nothing that could possibly outweigh it and they don't they that's not convincing was there ever a convincing explanation for why mr. Ward's criminal behavior suddenly X you know escalated from exhibitionism and I guess burglary and some domestic violence to such a brutal and heinous rape and murder I understand that there was testimony about the stressors in his life and it's you know his lack of coping mechanisms but was there additional context that was ever offered for why he was capable of this crime if in fact he wasn't born this way because the again the disorder that he suffered from the one that everyone agrees he suffers from the the compulsive exhibitionism something he couldn't control he desperately wanted to control he desperately wanted to fix it he was not getting the help that he needed and over and over again he was getting in more and more trouble he was constantly in a situation where he he was on probation I think by that point in three different states and his life was falling apart he was immature unable to take care of himself in any way I hadn't been through much school he parents who were had their own problems and this is just someone who who I mean I don't know that we ever get an absolute clear nexus and I don't think there were well that's the thing there isn't I'm looking at part 2 capital e3 of the Indiana Supreme Court's opinion on post conviction where it says we sum up and weigh all the evidence as follows and then it goes through mitigation on one paragraph and aggravation on the other paragraph I don't see a word they're saying there's nothing that could have been said they look at what's on both sides and they finally say after weighing the totality of the mitigating evidence against the evidence of aggravation etc they don't see any reasonable probability that the post conviction evidence would change anything how how do we say that's so far out of bounds that the standard set forth in 2254 are met because they didn't consider the absolute harm the weight that was caused this is it is as if he had we see where do we how can you say that they don't even acknowledge that that that it was harmful for her to begin with it's it's if they're out of thought so they may have thought look she tried or it was the first trial lawyers tried and this is mentioned actually in the Indiana courts opinions to say that he's actually not the monster he seems to be he was nice to his grandfather he had other redeeming features he gets the new trial actually because of venue not because of anything else but he gets a new trial it's handled by the same lawyers who do the appeal in the first trial so presumably they know that record and they think well that didn't work you know let's try mental disease you know psychop that he's a psychopath now you can sit here maybe I can sit here and think boy that sure didn't work you know people aren't terribly taken to psychopaths but they didn't have many cards to play the first trial was reverse because the the community and the jury was so biased venue problem they they didn't grant the change they said they wanted him hung or shot at the yeah immediately no I get it so assessing what didn't did not happen or how strong the mitigation was or those factors from that first trial based on that jury wouldn't have made any sense it's also not what counsel did and there were the first trial was not complete either so I don't think when you look at the first trial there were two lay witnesses mom and dad dad was dead by the time of the second trial three mental health experts that gave inconsistent testimony with one another something pointed out by the prosecution you know there were certainly factors in there that that she wanted that miss young court said she wanted to follow through on and she she intended to to do that but she didn't so I don't think we can look at the first trial as a gauge for looking at the reliability of or the prejudice for the second trial interrupt and I know there's a bit of a delay so it makes it difficult for you but you know this was such a horrific crime committed under circumstances that show planning a skill miss is such obvious dangerousness on mr. Ward's part that I it begs the question whether the defense theory that was presented at the nuanced and humanizing then then the theory that was presented at the second trial but where could it have ever offered any realistic likelihood of it of a different result how how how could there have been a different result there are cases where people have committed a severe crime terrible crimes Christopher Stevens case murdered a ten-year-old little boy try to smother him try to to while he was saying I love you I love you after having molested him thirty five times there are many capital cases have very very severe facts rompilla's case had very very severe facts he was also found guilty of of torture and or as an aggravating factor and future dangerousness were found as aggravating factors in that case that doesn't rule out the possibility that a jury unencumbered by the the having two prosecutors is basically what happened here couldn't find reason for mercy one juror says if this had been my kid I would have moved heaven and earth to help him if this had been my child I would have made sure that he got the help that he needed I would not have let him suffer for this long he needed a pill he needed antidepressants his disorder is treated with antidepressants and was being successfully treated in prison with antidepressants dr. Cunningham at the first trial pointed out this man had been incarcerated had never had incidents of violence in prison and that that was the best predictor there was abundant evidence that they could show that this person who was repeatedly described as like a child goober was his nickname was someone that was worthy of sympathy and when you have a case where the first trial is a biased jury the second is one where counsel is literally acting as a prosecutor to assume that this is standard mitigation mitigation that does work in other cases mitigation that jurors can relate to could not have made a difference is unreasonable the second trial though actually quite a bit of the evidence elicited in post conviction about his deficiencies of his parents and his attention deficit hyperactivity disorder learning difficulties the exhibition it comes out maybe not in quite as nicely packaged away so the second jury does have before it those kinds of facts to it's just not persuaded to recommend life in prison without parole it's absolutely a lot of it was presented to the jury but they were told that he was born without a conscience why would it matter who cared what his parents were they literally told them this doesn't matter this exhibitionism had nothing to do with it he is a monster he is born without a conscience he was not capable of human emotions anything that was inconsistent with that they ignored they explained well he said he experienced regret well that's what psychopaths say well we don't know that they ignored it I mean it actually if they thought he had a conscience and he did this crime they might have thought that was even worse I mean I don't know what what they thought of course but it doesn't seem to me it's a one-way possibility well I think that the way that they testified shows with something that's done a lot of times when I mean psychopathy comes up in criminal trials almost always by the prosecution and defense counsel are used to looking at this and one of the they tend to ignore any evidence that is inconsistent is somehow relegated to well he must be lying or he's being manipulative you know that's what happened here that's the way they are portraying him and if you look at that evidence and you see the picture of the monster the picture adopted by the prosecutor that is portrayed here how would any how could you possibly give effect to any other mitigating evidence that you could have discerned from you throughout here certainly the evidence trying to show you wouldn't be a future danger was undermined by the experts very directly and very clearly also the evidence of his his family I mean you know when when his mother said something like you know yeah he loved Don Scott he had his long relationship with her and so forth his the the experts said well that couldn't be really love because he's a psychopath so I I don't I don't think it that's and that's part of the problem it doesn't of course even her testimony is equivocal she's not giving him a full endorsement miss Scott Don Scott well I her testimony is that she has been his friend for a very long time which is true and that that she is someone that he had a lot of very good qualities they also thought he was very immature and yeah he had some bad qualities and that comes out and certainly as the Supreme Court has said sometimes we have little facts that come out that you know aren't always positive that doesn't necessarily undermine the case and if that is all that had happened here that would be fine I would like to go back if we might to something that I really you know have been thinking about quite a bit and that is that I gather there wasn't any real disagreement among the five defense experts that have examined mr. Ward that he does suffer from antisocial personality disorder am I correct well no actually the first time he was diagnosed with either antisocial personality disorder or psychopathy was at the second trial the first there were experts at the first trial they all evaluated him none of them diagnosed him with that and any expert that he had seen prior to this in central state or these other treatment connections with treatment programs he didn't actually participate in most of them but no one had ever diagnosed him with that before and that was conceded by both dr. Parker and free event the differences and I I want to make it very clear I'm not suggesting that antisocial personality disorder in of itself is a mitigating factor I'm not saying the bad thing she did here was put up psychopathy and she should have just put up antisocial personality disorder there was a much nicer picture yes so but so and what they said about antisocial personality disorder at the second trial they didn't focus on it in fact at one point the state actually had complained during cross-examination why don't you talk more about antisocial personality disorder and so I think that they explained it in a way that this is a pattern of antisocial behavior we have to look at the causes of that behavior he had ADHD that causes antisocial behavior when you're a child he had a learning disability he had this exhibitionism look at what is in the family dynamics look is what is causing the antisocial behavior and not just relegate him to a label and they certainly said very clearly they did not think he was born that way well but I'm gonna go back to say the overall performance of the lawyer because we don't pick out one thing or another thing they do put Aiken on the stand who's quite clear that in his view and he's got a lot of experience a very good witness in his view Ward can be managed in a high security prison setting so whatever the psychiatrist or psychologists may have you have a professional correctional person saying sure you know we can manage guys like Ward and doesn't seem to vary when he says that well he doesn't seem to vary but the research first of all shows that the jury was likely to give more weight to the psychologist can only do what they can do but they put they put evidence in the record that says he's manageable so the jury has before it again I it's not like you were me coming it's not a highly experienced professional in the corrections business in Indiana who knows presumably what facilities are there and what measures they can take says it's gonna be okay if you don't give this guy the death penalty he's gonna be controlled and you know I don't know what else you can ask the lawyers to do even if the jury might think that this is a disgusting crime and that punish him I think we could have asked her not to put up to psychiatry psychiatrists and psychologists that said one of whom said inaccurately that research suggested that with mr. Aiken just told you it's not true for a very small subset of individuals and one of them is mr. Ward which is basically that he is going to be a change or he is likely to be a danger in prison that was inaccurate information and that was Friedman Parker said that he was likely to escape try to escape and he would not be dangerous unless it was with a woman or someone he could overpower I believe her also said yes said something like well he's okay as long as you don't take your eye off yes they both leave both of them suggested so I don't see how that's a consistent presentation and and I don't see how dr. mr. Aiken's objective point of view of what we can control people in prison is going to trump their point of view which they are claiming is coming from their own but that sounds a lot like de novo review to me I just have to say oh here's here's where it is on page 14 of your brief he Parker says Ward would only be a threat in prison to someone smaller or weaker than himself or perhaps if you could catch someone in a moment when he had the upper hand which sounds like pretty much always when he's out of his cell now if he's in his cell 24 hours a day seven days a week then I guess that's not a problem I didn't understand the question about to know review well I mean the kinds of things you're saying about reweighing the evidence are disturbing to me only in the sense that that's not our role at this point we need to look at what somebody else did and see whether what they did is supportable by the evidence I think the Indiana Supreme Court special findings and their decision to look at this by viewing psychopathy as a mitigating factor without taking to into account the kind of aggravated aggravation aggravating effect it most certainly had in so many different ways on this case is unreasonable and at that point de novo review is all you can do okay if you'd like to save I like you like for rebuttal I would like to do that thank you very much may it please the court this court should affirm the denial of habeas relief because the Indiana Supreme Court reasonably determined that ward was not denied the effective assistance of counsel I'd like I'd like to actually be on the facts of this case or really any case for that matter why was it a label mr. Ward a psychopath doesn't that invite the very response from this that the state made in closing argument which is to say that the only realistic thing you can do with a psychopath is to incapacitate him psychopath has a meaning that strikes any individual who's ever heard the word with terror here what defense counsel was dealing with was two traits of psychopathy that were present in this case that defense counsel couldn't do anything about that they were present first that ward was not remorseful at all about his crime and second was given the facts of this crime and his criminal history that he would be a future dangerousness future danger to society and so counsel did what one of the two things you can do when you have damaging evidence that you have to deal with is either confront it straight on or ignore it and wait for the other side to bring it up and then try to deal with it there those are both reasonable strategies and what defense counsel did here was confront it straight-on explain what psychopathy was and then offer evidence as to why the jury should still give him life without parole so the remorselessness explain that it's not his fault he was born this way and the way he grew up made him to be someone who doesn't have emotion but there was evidence there was actual evidence that he might still be capable of some type of regret or remorse that he had been in the past and doesn't a defense team have to develop and emphasize whatever evidence it has along those lines isn't that wouldn't you agree that that is the first and most fundamental obligation of his attorneys rather than to come out and suggest that he's incapable of such feelings as I say when there was evidence that the man was desperate at he was capable of feelings of remorse and regret first of all I think the evidence of that is is subject to debate but certainly counsel had to decide how to use that evidence because it actually cuts both ways because if the the defense counsel emphasizes that word is capable of remorse and capable of that and then has to acknowledge he has no remorse for this horrific crime that is likely going to be more damaging in front of the jury then presenting evidence that perhaps he could be remorseful at some point because there's there's really no evidence that he was remorseful about this crime the the and I forget which one it was during post conviction that he regretted the crime but about his letter to the judge about that he regret you know that he had regret that dr. dr. fit Ferraro testified that even even when Ward expressed these kind of feelings that he realizes that it's not the type of to have or or should have and so even even those those kind of indicators of remorse don't fit with what the jurors were saying which every day in court he's emotionless even when the graphic pictures are being shown and and what he did is being described he sits there emotionless and and that's what dr. I mean a Steven Ripster one of the attorneys actually spoke with six of the jurors from the first trial and asked them what what what did you think of the evidence what were your impressions and one of the things that were that the jurors were communicated to him were that we really were concerned because he sat there during trial and didn't offer any kind of emotion no and so Steven Ripster I knew that they needed to explain that to the jury in some way they couldn't just ignore it because that was something that the jurors were going to be concerned about and in that regard I just want to clear up there there is a mistaken citation in our brief on page 9 and 22 in which we talk about attorney Ripster and attorney young court looking at the first mitigation and deciding to take a different track that's actually at pages 57 through 59 of the post-conviction record and at page 462 for learned a young court we cited to 198 but that that's wrong I apologize for that I also want to address how we know that miss Rushton whose life was absolutely falling apart and who was assigned to prepare the social history only spoke to 12 witnesses she never got to the 40 or 45 other witnesses that young court had how do we deal with that as far as ineffectiveness goes I think what's telling about that is that in post-conviction none of those witnesses were presented as witnesses who should have been presented when you look at the motion for continuance in which young court says that we have 45 witnesses more we need to talk to she lists some of what those type of witnesses were and she says she wanted to talk to all the police officers and all the victims and all of wards public indecency cases that he had throughout his life so review for me how that part of his history ever got linked up to this crime the fact that he had these 32 instances or whatever the number was of the public indecency matters is there expert testimony that says that that proclivity on his part was somehow related to his decision to knock on the door and tell the lie about the lost dog and so on that's a I'm trying to figure out relevant and you know what it means really that's that's a little bit difficult because there are different ways that different experts approach that and so dr. Davis at the first trial testified that he actually exposed himself to the victim and that that maybe he went there to expose himself and then it escalated from that but but given wards account of the crime to dr. Davis which is very to use that so so then when we see it it really appears next is that counsel in preparing for the second trial says we've never had any explanation as to how exhibitionism leads to this in fact young court said exhibitionism from all I know and what I've been told by experts isn't violent it's a nonviolent phenomenon and so we need something to explain how this turned into violence now dr. Ferraro at the post-conviction you talked about it as being one of the stressors that then led to this just picture of Ward that he was just overwrought and because of all this going on in his life mostly because of the criminal aspect that he kept going to prison for exposing himself and and committing burglaries and everything else and so that was what led to him being very stressed out. So Ward was in his 20s when he committed this crime? I believe he was in his 30s. I do want to do want to touch on dr. Parker and dr. Friedman's testimony about dangerousness in prison. Yes, I'm concerned about that because that's not what I would have expected to hear from a defense witness. Dr. Parker if you the page that you cited that is cited in their brief his answer to the answer could he be a danger to other prisoners probably not his violence that as I understand it tends to involve people that he thinks are larger or more dangerous than the other person he's not in some he's not of those small but mighty people that are difficult to fight with he's probably more likely to be a victim in prison than he is to be an offender in a fight and then would he be a danger to a female prison guard you have to remember that there's a power differential and he's acutely aware of that the female prison guard has the power advantage over him so dr. Parker was testifying he wouldn't be a danger and then dr. Friedman at page 1970 says he's a low risk that he would commit violence in prison the the heat on cross-examination the prosecutor brings him some reports about risk of psychopaths in prison and dr. Friedman actually downplays those says I don't think those studies really reflect they're kind of broad-range studies that don't aren't really helpful and if you look at you need to look at the individual and if you look at the individual of Ward and he says on 1975 page 1975 he given his background would not be a danger in prison so both dr. Parker and dr. Friedman's testimony about not being a danger in prison dovetailed with James Aikens testimony that he wouldn't be a danger in prison and those were really the two one of the two things that counsel was trying to convey to the jury was we know that research shows that you're concerned about remorse and you're concerned about future dangerousness he's not going to be a future dangerous in prison it prison if you give him life that parole and we can explain the remorse that it's not his fault he was born that way and had an environment that encouraged it and so you can't blame him for the remorse either yeah it seems to me if what you would really been setting out to do is present a mental defect kind of case and that's really what you're saying because of perhaps the time stress on this lawyer who seems to have been very over committed as far as I can tell and the failures of the investigator that defense never really gels and he just kind of has to throw it in as it is because the trial courts stuck with the trial date now that still leaves my other question which is how does one deal with the Indiana Supreme Court's finding of no prejudice but in terms of the performance it seems like a fairly clumsy presentation of a mental defect my review of the closing argument and I asked you to look at defense counsel's closing argument she did the best she could with what evidence she had she made the most compelling case she could to the jury now it did but with what evidence she had now had she had more time to put together a more coherent story of mental defect which is part of it which we see well that that that gets to choose my other point that would be that that there really isn't any difference with the post conviction testimony as the trial testimony so given more time they have experts who testify to the same things that the experts testified at the trial less inflammatory way miss Donnelly well well perhaps only because they are not pushed in any way other than to say the dr. Parker and dr. Friedman their assessments are totally consistent with ours so you know pushing farther about what is exactly does that mean wasn't done but if they would have been arguing if they would have been presenting evidence to the jury that would have that would have the state would have brought out the psychopathic features of Ward and more explored those but they didn't need to on post conviction because the experts were saying our assessments the same I think something that you've missed is that at the post conviction hearing judge Jacoby who had been Ward's former counsel on that whole series of indecency charges gave extremely important testimony about the remorse and the shame that Ward had felt regarding his criminal behavior and related to that you had the medical records from the state hospital evaluation of Ward that were apparently also missed in the original investigation that reveal how genuinely and how urgently Ward wanted to know what was wrong with him so that type of evidence it seems to me standing alone would be highly relevant to a jury's penalty determination in a capital case there's no doubt that it would have been relevant and available for trial counsel to present the question is whether it was an unreasonable decision not to present it and judge Jacoby while he did testify to remorse it was in the context of him representing him while Ward was on bond for a public indecency then goes out and commits three more public indecencies and has to go to back to jail and so he said at that point he was you know pretty sorry that now he's sitting in jail over this but for all the times in which Ward says he wants help that's not what judge Jacoby testified to he testified to pure remorse and regret not because you know he didn't testify that he was remorseful because he was sitting in jail that's the spin that the state puts on it and one expert and when you look at the the times that Ward says that he wants help all of those are followed up by him not following through with treatment treatment being discontinued because he's not involved with it dr. Edwards testimony during this second trial so how much of a difference that would have made when the main argument that council is trying to put forward and trying to give the jury a vote for life was that the remorseless but the fact that he wasn't remorseful about this particular murder is not his fault and that he can be housed safely and that was a reasonable strategy as the Indiana Supreme Court found and Ward has not shown that that determination by the Indiana Supreme Court is itself unreasonable I just want to point out one quick thing about Don Scott just a reminder about that relationship that relationship was a sexual relationship when Ward was 16 and Don Scott was 12 so to talk about it as being they were in love and showed his emotion you have to remember what type of relationship it was from the so not sure how that shows that he shows emotions or anything else other than he seemed to prey on Don Scott as well I want to just go back for one moment if I'm if I might because what what has bothered me is the Indiana Supreme Court has been debunked in quite a number of cases and it seems to me that so long as you can show that defense can't prove that it was a sexual relationship it doesn't matter who you talk to and it doesn't matter who you neglect to talk to and that notion has been debunked in quite a number of cases and it seems to me that so long as you can show that defense counsel knew about other witnesses and other lines of inquiry that might have yielded favorable information and failed to follow up you've got a fairly good case there for ineffectiveness and of course you know we all know now that young court knew that the mitigation investigation was what was incomplete and missed very much the debt penalty well here besides the blanket suggestion that by the mitigation expert and by young court that more could have been done there has to be at least an indication of what more could have been done and just just to point out it wasn't just not saying or are you that they haven't shown what could have been done the different experts that judge Jacoby for one other witnesses I mean Miss Young Court begged begged for continuances over and over and over said she wasn't ready she wasn't ready had six other death penalty cases on her plate she was in a terrible pickle and and she wasn't doing this alone she had co-counsel Stephen Ripstra who was doing a lot of investigation and legwork at the same time she was using her husband who is a retired sheriff's deputy as an investigator to go out and find things she did a lot of things of talking to people judge Jacoby was known to defense counsel was listed on their witness list and they decided not to have him testify so what further investigation it there there could always be more investigation you could always talk to more people but surely it's not the standard that defense counsel has to talk to anybody who has ever had contact with the defendant before they're doing it before they've done a reasonable investigation and here I was going to say I think one of the questions is and I think you alluded to it a little while ago is how much of a sense do we have of who didn't get pursued and what they might have said you've indicated that some of them were people associated with the exhibitionism because that's how you have to do it you have to say you know I at the post conviction you know I wasn't allowed to look at the following 15 witnesses and had I been able to they would have shown that he can show remorse or they would have shown that this really is a disease or they could have shown whatever they might have shown and so I guess I'm interested in how good the record is on the missing pieces there there really isn't any demonstration of post conviction of a line of inquiry or witnesses that went undiscovered that the the one witness that I can find that was presented post conviction that that wasn't presented at the second trial was Don Scott's mother who was going to testify to the same thing that Don Scott testified to which was I thought that they were a good couple and I thought Ward was a nice nice boy which isn't an extra kind of piece of evidence it's just cumulative what Don Scott testified to so there isn't there isn't that unlike any of the Supreme Court cases that have found the investigation to be inadequate where whole swaths of a person's life have gone on on looked at that's not what we have here at all if there are no further questions we ask that you affirm the district court judge Roger said okay thank you Kobe just ran away I'm back he's back I was trying to find out if you had any further questions if you do please go ahead well I I just I think I I think you can run away thank you for coming back mr. Kobe all right miss Donnelly I think there were excuse me some viable alternatives to talking about mr. Ward's apparent lack of emotion for example parental modeling his father was universally described as someone who didn't show emotions children learn from their parents and that we didn't have to go to psychopathy to do that and say he was incapable of experience that that feeling the same with future danger at the first trial dr. Cunningham reviewed every single prior conviction he had a lot because he had been in jail for all these the exhibition charges and so forth and and said based on past performance which he said based on his research and he has done extensive research on predicting future dangerousness that there was no likely or it was very unlikely that he would be a danger in prison that he had not had incidents of violence based on this prior incarceration and and so there were alternatives to psychopathy I would also point out that she didn't prove the one thing that they say well that was so important here which was that he was born this way because there isn't any agreement among experts that there is such a thing as being born with this condition or any particular brain abnormality that is going to ask you my recollection is nobody did brain scans or otherwise examined the physical makeup to see if there were odd lesions or they absolutely did not nothing and then they had to concede that so if that was what she was trying to get out of this she utterly failed to do it and I he couldn't and she could just to be clear she did not have judged to Kobe she did not have the central state records there were a few other witnesses listed in our brief and she was asked on each one if this is the kind of information that you would provide but as I said at the beginning that the rest of the claim is not just what she didn't do but it's what she did in response to having not completed her investigation and that certainly made a difference because what she did nullified anything that she did by presenting psychopathy it nullified anything that she did present and mitigation and in terms of mr. Ward's the it is there's no data one way or other whether whether that necessarily proves that people who have this kind of problem exhibition isms clearly have different levels of severity mr. Ford's father had the problem his grandfather had the problem his great his father's response to this trial the conviction was to go out and commit another crime so so but clearly it doesn't always 100% of the time lead to more violence but there is evidence that it does sometime do that for precisely the reasons that the experts at the post conviction and at the first trial talked about some of the experts it is something he cannot control by himself he was 28 years old when the yes did you do any sort of research to see if psychopathy has been used as a defense in other death cases I cannot think of any case where it has been successfully used miss young court did research prior to trial she testified to this it's petitioners exhibit 37 it was the hearing on dr. Friesman's $55,000 bill she said she called around the country not just in Indiana but around the country and could not find a single lawyer who would would would suggest how she could possibly do this and I am it is definitely outside the mainstream of of what any person would do reasonable lawyer would do in a case a capital case but I do think that hearing about how that horrible condition something he was born with apparently eight years old is the first time he does he's 28 by the time that this crime occurs and hearing about how much he tried over and over again how ashamed he was how much he wanted help and how no one was able to help him and this is not someone who's capable he's living it with his parents he can't get a job he's slow he has a low IQ he has disabilities he has no education desperately wants help very much wants to do that and can't cannot get it that is the kind of pressure and it does in cases have led people to to explode like this so I asked this court please to reverse his death sentence all right thank you very much and we appreciate very much your assistance to your client and to the court thanks as well to the state we will take this case under advisement the court will be in recess